CASE NO: 2:06-CV-1657 MCE DAD P
(habeas corpus)

November 20, 2007

FILED
NOV 26 2007
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

Dear Clerk of The Court,

Please forward the enclosed letter and supporting material to the Chief Justice.
My hope is is that he will acknowledge the facts as I have presented them and then instruct his writ clerk to obtain my writ of habeas corpus and have it forwarded to Magistrate, Dale Drozd for an immediate ruling.
I am a factually innocent man and this is an absolute emergency.
Thank you and have a nice day.

Respectfully,
Vy Lopes

TY ERIK LOPES #T-58072
MULE CREEK STATE PRISON
P.O. BOX 409020
IONE, CA 95640


Habeas corpus   No.   2 06-cv-1657 MCE DAD P.

November 20, 2007

Dear Presiding Justice,

   Hello Sir. My name is Ty Lopes and I have been framed my the Manteca Police Detectives and by the San Joaquin County Prosecutor's Office for murder and rape! This past August I filed a EMERGENCY MOTION in Judge Dale Drozd Court asking that he rule on my habeas corpus petition. I believe that I have shown that I have been horrifically imprissoned illegally and that even my Trial Judge believes that "there was '<u>NO EVIDENCE</u>' that I was [involved in Renee Ramos' murder] even." My Trial Judge said, "<u>I KNOW THAT</u>." (RT 1087: 5-19) That was admitted by my Trial Judge <u>AFTER</u> the prosecutor rested his case-in chief against me Sir. Also, on my 1118.1 motion for acquittal immediately following the prosecutor's case-in chief regarding the rape and the special circumstance charges in count 1 of the accusatory pleading, my Trial Judge ruled that "THE EVIDENCE <u>IS INSUFFICIENT</u> TO ESTABLISH THE COMMISSION OF THE CRIME SPECIFICALLY CHARGED IN THE ACCUSATORY PLEADING" but he denied my motion anyway. (RT 1050: 22-24)
   Please Sir, I beg that you instruct Judge Dale Drozd to rule on my habeas corpus petition that has been pending for over one year already. The horrible burden that my family and I are being forced to endure is absolutely immense! The horrific negligence by the Trial Court and the sickening lies and deception that I have shown throughout my habeas petition and in my Traverse to "Answer" is alomst beyond belief. Please Sir, help end the suffering that has been maliciously bestowed upon me and my family, and many others as well and help me force the Manteca Police Detectives into going out and finding whoever it is who really murdered that poor Manteca girl!
   Thank you and have a nice day Your Honor.


Respectfully,
*Ty Lopes*
Ty Erik Lopes (FACTUALLY INNOCENT)


PS. It is going on eight years now Sir since I was arrested unexpectedly on Sept. 15, 2000 while I was preparing to enjoy a weekend visit with my then 13 year-old daughter. I was coerced into accompanying 2 detectives over to the police station to "look at some photo's" of Renee Ramos' friends. I haven't been home since!

TY ERIK LOPES, #T-58072
MULE CREEK STATE PRISON
P.O. BOX 409020
IONE, CA 95640

Petitioner's Copy

ORIGINAL
FILED

AUG 0 3 2007

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
              DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TY ERIK LOPES,<br><br>                    Petitioner,<br>v.<br><br>ROSANNE CAMPBELL, et.al.,<br><br>                    Respondent, | 2:06-cv-1657 MCE DAD P<br><br>EMERGENCY MOTION FOR<br>IMMEDIATE RULING ON<br>PENDING HABEAS CORPUS<br>PETITION |

I, TY ERIK LOPES, petitioner, respectfully plead for this court to rule on my pending habeas corpus petition and my related motions that are pending as well. In support of this EMERGENCY I provide the following factual information.

1. I AM A FACTUALLY INNOCENT MAN! My habeas corpus petition was filed in this court on July 27,2006. The Respondent was ordered to respond to my petition. The Respondent filed an "Answer" and I Traversed the "Answer," and my Traverse was filed on December 27,2006. I then filed an AMENDED Traverse on February 2,2007. I have also filed (2) two related motions since my Traverse was filed, not including this one.

2. I respectfully submit that the grounds in my habeas petition and the information shown in my Traverse to the Respondent's "Answer," as well as in both of my previously filed motions, shows conclusively that A MASSIVE INJUSTICE HAS OCCURED and that it is clearly obvious.

(1)

3. A lengthy detailed explanation of the FACTS is not necessary here as I feel that this court already has all the FACTS needed in this case to discern that I have been railroaded and am illegally imprissoned. However, I would respectfully and concisely reiterate the FACT that the Judge who presided over my trial horrifically failed to apply the crucial safeguards that are embodied in Penal Code Section 1118.1 and in Rule 29(a) of the Federal Rules of Criminal Procedure when he ruled on my oral motion for acquittal immediately following the conclusion of the peoples case-in-chief during my actual jury trial. (See ground 3 of my habeas petition) As clearly established U.S. Constitutional Law shows, when the court states that there was "insufficient evidence" to establish certain elements of the crime, and in this case, the entire crime itself, as my Trial Judge clearly stated was the case, the 9th Circut Court of Appeals has expressly ruled that the phrase "insufficient evidence" is a term of art and—absent a contrary indication—means that the evidence was insufficient to support a conviction as a matter of law and is equivalent to an acquittal and barred retrial under the Fifth Amendment. (Mannes, supra, 967 F.2d at pp. 1315,1316.) I also respectfully submit that common sense prevails here as well. My Trial Judge clearly stated that "the evidence is insufficient to establish the commission of the crime specifically charged in the accusatory pleading" when he ruled on my motion under the authority of Penal Code Section 1118.1 at the close of the peoples case-in-chief, (RT 1050: 22-24) yet the Judge horribly failed to acquit me on the specific charge of rape that was, in fact, illegally refiled in the information following my prelimanary hearing as shown in ground 1

(2)

of my ha... Ramos was murdered was centered around sex and avoiding detection of rape. As shown on page 16 of my petition the Judge clearly told the prosecutor: "NO, I'M NOT BUYING THAT ONE." (RT 1129: 3-5) There is absolutely no indication that my Trial Judge meant anything contrary to the plain meaning of the phrase he used when he ruled on my 1118.1 motion as to the specific charge of rape at the close of the peoples case-in-chief. It is also clearly established that the courts need not restate the substantial evidence standard or use "magic words" whenever they determine that the evidence is insufficient as a matter of law. It is merely requested of trial courts that they make their ruling clear enough for reviewing courts to confidently conclude they viewed the evidence in light most favorable to the prosecution. In this case the Judge clearly stated that: "I have listened to the evidence" during his ruling on my 1118.1 motion. (RT 1050: 28—1051:1) The Judge was clearly referring to the prosecutions evidence as this court can clearly discern as I hadn't even put on my case yet in which the Judges ruling forced me to do. (RT 1051: 1-4) My subsequent motion for an 1118.1 acquittal on the murder charge in count 2 of the accusatory pleading was also erroneously denied as the prosecutor relied on the "SAME EVIDENCE" that the Judge just ruled was insufficient as to the rape charge when the Judge asked the prosecutor for a response to my 1118.1 motion as to count 2. (RT 1051: 11-20) Then, on the very next day during Jury instruction discussions and still before I put on a defense case, the Judge completely agreed with my attorney when he told the Judge that "THERE WAS 'NO EVIDENCE' THAT I WAS THERE EVEN" at this phantom "teenage party" gone horribly wrong FABRICATION! (RT 1086: 10—

(3)

1087: 19) As this court can see my Trial Judge said, "I KNOW THAT." (See ground 4 of my habeas petition) Indeed, the United States Supreme Court has long held that "what constitutes an 'acquittal' is not to be controlled by the form of the Judge's action." (Martin Linen Co., supra, 430 U.S. at p. 571 [97 S. Ct. at p. 1354].) Rather, appellate courts "must determine whether the ruling of the Judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." (Ibid. [97 S. Ct. at p. 1355].) If a trial court rules the evidence is insufficient as a matter of law, then the ruling bars retrial even if it is patently erroneous or the court has no statutory authority to make it. (See Sanabria v. United States (1978) 437 U.S. 54, 64 [98 S. Ct. 2170, 2178, 57 L. Ed. 2d 43] [a trial court finding of legal insufficiency based on an erroneous foundation is still an acquittal for double Jepordy purposes]; People v. Valenti (1957) 49 Cal. 2d 199, 203, 209 [316 P.wd 633]; see also Fong Foo v. United States (1962) 369 U.S. 141, 143 [82 S. Ct. 671, 672, 7 L. Ed.2d 629] [a ruling by a trial court acquitting a defendent bars retrial even if the ruling is "egregiously erroneous" and the court lacks the power to make the ruling].) However, in my case, as shown in grounds 3 and 4, as well as in ground 1, the Judge "legally erred" when he failed to acquit me on all counts after clearly stating that "the evidence is insufficient to establish the commission of the crime specifically charged in the accusatory pleading" when he ruled on my motion for an 1118.1 acquittal, specifically as to count 1. Then, as to count 2, the Judge asked the prosecutor for a response to my acquittal motion and as shown in ground 4 of my petition, the prosecutor relied on the "SAME EVIDENCE" that the Judge just ruled was insufficient as to count 1, to

(4)

prove the elements of the crime of murder as I have already shown on page 3 of this EMERGENCY MOTION! (RT 1051: 11-20) Too, the Judge completely agreed with my attorney when he told the Judge that "THERE WAS 'NO EVIDENCE' THAT I WAS THERE EVEN" during Jury instruction discussions on the very next day in which the Judge answered, " I KNOW THAT." (RT 1086: 10—1087: 19) Extremely important and very telling also is Detective, Joe Morgon's testimony. He was the original lead detective assigned to find who murdered Renee Ramos and he later became number 2 in charge of the investigation. (CT 544: 4-16; RT 953: 21—954: 2) He confessed while under oath the FACT that they "STILL DON'T" know where Renee Ramos was killed. (CT 546: 5—547: 22; RT 975: 5-21)

4. This is a case that is built upon nothing but FABRICATED LIES, motivated by over-stressed, incompetent police detectives who are just as clueless as to how Renee Ramos ended up in such a horrible situation as I am! Because of those FACTS these same police detectives and their conspiring cohort's have maliciously torn me and my family, and several others lives to absolute pieces, and Judge Harrington helped them! (RT 49: 17-25; 192: 24,25; see also pp. 36-38 of my Traverse to the Respondent's "answer" to my habeas petition) THIS IS AN EMERGENCY ON A GRAND SCALE! The suffering perpetrated on me and my family and the horrible burden we're continuing to endure is absolutely IMMENSE! I beg this court to call-up my habeas petition from the Writ Clerk of this court and then grant me and my family the total relief we have deserved for going on seven years now!

Respectfully Submitted,

_____
Ty Lopes (Petitioner)

(5)

DECLARATION OF SERVICE BY MAIL

Case Name : Lopes v. Campbell, et.al.,

Case No.: 2:06-cv-1657 MCE DAD P.    (Habeas Corpus)

I declare:

I am the defendent and the petitioner in this case. I am over the age of eighteen. I am in custody and I am housed at Mule Creek State Prison in Ione, California.

On Aug. 01, 2007, I served the attached EMERGENCY MOTION FOR IMMEDIATE RULING ON PENDING HABEAS CORPUS PETITION by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the outgoing prison mailbox here at Mule Creek State Prison, addressed as follows:

Tami M. Warwick
(Deputy Attorney General)
1300 I Street, Suite 125
P.O. BOX 944255
Sacramento, CA 94244-2550

I delare under the laws of the State of California that the foregoing is true and correct and that this declaration was excuted on Aug. 01, 2007 at Ione, California. I state so under the penalty of perjury.

Ty Lopes
Ty Lopes (Petitioner and declarant)            Signature

(6)

1  was on her. He did not testify about any rape.

2  Detective Souza came in today, Well, he told me that
3  he held her hands while Jake was having sex with her. That
4  may or may not have been a rape if, in fact, that happened.

5  It's completely unbelievable when you apply it to the
6  rest of the evidence, where there's unsubstantial evidence
7  of the existence of each element of the offense charged and
8  I submit there's not.

9  THE COURT: Anything further?

10  MR. SCHULTZ: Submit.

11  THE COURT: Well, the case provides, this is
12  found in Section 26.7 of the California Criminal Procedure
13  Practice, Fifth Edition, they are talking about the nature
14  of the motion and standard of review in trial courts. This
15  is under the Motion for Judgment of Acquittal.

16  It says, "The test to be applied by a trial court in
17  deciding a Penal Code Section 1118.1 motion is whether from
18  the evidence, including reasonable inferences to be drawn
19  therefrom, there is any substantial evidence of the
20  existence of each element of the offense charged." They
21  cite People versus Ainsworth (1988) 45 Cal. 3d 984. "The
22  trial court is entitled to consider whether, although the
23  evidence is insufficient to establish the commission of the
24  crime specifically charged in the accusatory pleading, the
25  evidence is sufficient to sustain a conviction of an
26  uncharged, necessarily included offense that the evidence
27  tends to prove."

28  I'm not saying whether or not there is -- I have

listened to the evidence, and since the defense has not presented their evidence at this time, I feel a little bit reluctant to comment on the believability of the witnesses. I think that's a jury function.

There are certain -- if there is evidence to prove any lesser included, lesser included rape, attempted rape, battery and simple assault, if any of those can be found, the 1118 motion, 1118.1 motion is not an appropriate motion.

The motion is denied.

MR. WRIGHT: I will would also under 1118.1 make a motion for a judgment of acquittal on the murder charge. I assume that's going to be denied also, but I am making the motion.

THE COURT: Response?

MR. SCHULTZ: Well, the same evidence that you heard in the rape is also going to the murder and the strangulation, and I would submit it on the evidence that's been presented, Your Honor.

THE COURT: That motion will also be denied.

MR. SCHULTZ: Your Honor, there's one other thing I did. We marked as 65 and 65-A the tape, but I think we should probably mark -- I pulled out all the transcripts -- one of the transcripts. So it's in the court record perhaps 65-B.

THE COURT: I don't know if you ever moved to have those admitted.

MR. WRIGHT: No.

```
 1  the beginning in 1a.  What do you need with two?
 2              THE COURT:  Escape to avoid detection.
 3              MR. SCHULTZ:  Or avoid detection.  He killed
 4  her to avoid a detection on the rape.
 5              THE COURT:  No, I'm not buying that one.
 6              MR. SCHULTZ:  Well, there's evidence.  The
 7  Court can do what it wants.  There's evidence that they,
 8  from Charles Cooper, that they killed her about going to the
 9  cops, that sounds like they are trying to avoid detection of
10  the rape, that's why they killed her.
11              MR. WRIGHT:  It looks to me --
12              MR. SCHULTZ:  Am I misreading that?
13              MR. WRIGHT:  It looks to me you can't have it
14  both ways is the thing.  You are going to have to have some
15  type of theory here.
16              THE COURT:  I am going to delete it.  I don't
17  think it's appropriate.  Also was merely incidental to the
18  commission of the murder.  Here give definition of crime if
19  not previously defined.  What does that mean?
20              MR. WRIGHT:  Where are we?
21              MR. SCHULTZ:  Sometimes you can charge murder
22  in special circumstance rape without giving the rape.
23              THE COURT:  Have we given definition of rape?
24              MR. SCHULTZ:  We're going to get to it.
25              THE COURT:  All right.  Leave that out then.
26     8.38.
27     I have run out of your instructions.
28              MR. WRIGHT:  There are some more of his
```

1           THE COURT:  If he doesn't testify, it's out.

2           MR. WRIGHT:  Even if he were to testify, I
3   don't know why he would want -- why the prosecution would
4   want this instruction.

5           MR. SCHULTZ:  It depends on what he says.
6   It's kind of a --

7           THE COURT:  It's what he says.

8           MR. SCHULTZ:  It's what he says sort-of-thing
9   and we are talking about events that haven't happened.

10          THE COURT:  270.

11          MR. WRIGHT:  I object to that one.

12          THE COURT:  Whose confession or admission is
13  it?

14          MR. SCHULTZ:  Confession.

15          MR. WRIGHT:  An admission, I don't have a
16  problem.  Confession I do have a problem with.

17          THE COURT:  Whose confession?

18          MR. SCHULTZ:  I think we have a confession
19  from Ty Lopes when he tells Charles Cooper that we want to
20  pull a train, rape her, but not kill, that's not a
21  confession, that's not an admission.

22          MR. WRIGHT:  It might be an admission.  It's
23  not a confession.  A confession is "I did the crime."

24          THE COURT:  Yeah.

25          MR. SCHULTZ:  Well, I went there to rape her?

26          THE COURT:  You don't have to say "I did the
27  crime."  Let me read the legal parts to 270.

28      Confession, it's right there in the instruction, made

1  by the defendant in which he has acknowledged his guilt of
2  the crime for which he is on trial.  In order to constitute
3  a confession, the statement must acknowledge participation
4  in the crime as well as required criminal intent.
5              MR. WRIGHT:  We don't have that.
6              THE COURT:  What's lacking?  He admits
7  that -- assuming you believe Cooper, that's not the issue.
8              MR. WRIGHT:  Assuming you believe Copper.
9              THE COURT:  Assuming you believe Cooper.
10             MR. WRIGHT:  And if you believe Cooper, all
11  he said was, "I got a piece of ass."
12             THE COURT:  He also said he went there to
13  pull a train.
14             MR. WRIGHT:  Okay.
15             THE COURT:  There was no evidence it was
16  consensual.
17             MR. WRIGHT:  There was no evidence he was
18  there even.
19             THE COURT:  I know that.
20             MR. WRIGHT:  He or she has acknowledged his
21  guilt of the crimes.
22             THE COURT:  You don't have to say "I'm
23  guilty."
24             MR. SCHULTZ:  I guesses the question --
25             MR. WRIGHT:  Must acknowledge participation
26  in the crimes.  There you go.  Must acknowledge
27  participation in the crimes.  He did not acknowledge
28  participation in the crimes.  All Cooper can say -- he said

```
1    time I arrived.
2    Q.   Were you one of the first detectives there?
3    A.   Yes.
4    Q.   Did you act for a period of time in the investigation
5    of this case as the lead detective?
6    A.   Yes, I did?
7    Q.   What period of time was it?
8    A.   Approximately the first three months of the
9    investigation.
10   Q.   And after that time were you removed from that
11   position or sent on to other work?
12        How did it come about that you were no longer the lead
13   detective in this investigation?
14   A.   I resigned.
15   Q.   From the investigation?
16   A.   Yes.  I resigned as the lead investigator.
17   Q.   During the course of your investigation --
18        Well, let me refer you, first of all, to page 347,
19   counsel.
20             MR. SCHULTZ:  If you could give me -- oh,
21   that's okay.  I'll just do it a different way.
22             MR. WRIGHT:  Q.  Did you have a conversation
23   on approximately June 15th with Dr. Cooper by telephone?
24   A.   Yes, I did.
25   Q.   And was that discussing the pubic hair and head hair
26   samples of Renee Ramos?
27   A.   Yes.
28   Q.   And what was the gist of that discussion?
```

DENISE WHEELER, C.S.R. NO. 8254    *    SUPERIOR COURT REPORTERS
222 EAST WEBER AVE., ROOM B-69, STOCKTON, CA 95202 (209)468-2840

000417

1  A.   To the best of my recollection, no workers were still
2  remaining inside.  They had all been to an area northwest of
3  the Home Depot building.
4  Q.   Okay.  Couple of hundred of them?
5  A.   Maybe a couple hundred people in total.  Maybe a
6  hundred employees or workers.
7  Q.   This case got a lot of attention, didn't it, while you
8  were lead investigator?
9  A.   Yes, it did.
10 Q.   It was just about the biggest case ever in Manteca
11 while you have been on the force?
12 A.   One of the largest certainly.
13 Q.   There was a lot of inquiries from the press?
14 A.   I imagine there were.
15 Q.   In other words, a lot of -- some inquiries from the
16 city manager about it?
17 A.   I'm not privy to that myself.  I purposely -- I
18 isolated myself as much as I could possibly.
19 Q.   You removed yourself from the case in September.
20      Why was that?
21 A.   I resigned.  I felt that there were doubts concerning
22 my level of experience.  I felt that I was doing a good job
23 investigating but I certainly would commend the person
24 working side by side with me, Detective Sousa, at that time.
25 He probably had four times my experience.  I suggested to my
26 immediate supervisor that he name Detective Sousa as the
27 lead investigator and then Detective Sousa and I could
28 continue investigating the case as we were as a team and

1  just call him the lead investigator instead of me and maybe
2  we could appease --
3  Q.    You have a background in criminal investigation; don't
4  you?
5  A.    Yes, I do.
6  Q.    What does it -- at the time you were assigned that
7  case, what was it?
8  A.    Previous about a year experience as a radio dispatcher
9  in Alameda County.  About a year and a half with the sheriff
10 of Alameda County.  Approximately seven years of patrol time
11 with the Manteca Police Department, three of which were in
12 the traffic investigation, traffic accident investigation
13 division.  Maybe three years as a detective.
14 Q.    Okay.
15       And you had -- how many cases did you investigate over
16 the period of time you were a detective?
17 A.    Hundreds.
18 Q.    Some of them murders?
19 A.    This was probably the first actual murder but not the
20 first homicide.
21 Q.    Oh, okay.
22       How many homicides?
23 A.    Probably assisted on 15 to 20.   SEE RT 953: 21-25
24 Q.    Now, you had a search warrant prepared for the search
25 of Matthew Nozaki Fugi's home; didn't you?
26 A.    Yes, I did.
27 Q.    That was in June of 2000; wasn't it?
28 A.    Yes.

1  A.   Yes, I did.
2  Q.   Did you form an opinion as to whether she was killed
3  there or taken there from some other place?
4  A.   No, I did not.
5  Q.   Did you have a search warrant prepared for the search
6  of a Matthew Nozaki's home in June of 2000?
7  A.   Yes, I did.
8  Q.   And as part of your probable cause for the issuance of
9  that search warrant, did you put in your affidavit that as a
10 result of your noting that the floor of Home Depot was
11 covered in building debris such as Sheetrock dust, and that
12 this dust was absent from the bottom of Renee Ramos' bare
13 feet, and that she had multiple injuries such as abrasions
14 that had bled yet you located no blood spatters anywhere
15 near the body, it was likely that Renee Ramos was murdered
16 elsewhere, and her body was discarded at Home Depot?
17 A.   I don't know that it was likely.  Although I believe
18 that is from the affidavit, yes.
19 Q.   I correctly stated your affidavit, did I not?
20 A.   I would have to read it to tell you whether you did or
21 not.  But I believe that's accurate.
22 Q.   Let me show it to you.
23      And I've outlined it in yellow so you can look at it
24 easily.
25 A.   Okay.  Okay.
26 Q.   Did I correctly state it?
27 A.   Yes, you did.
28 Q.   And was that your opinion at that time, at the time

DENISE WHEELER, C.S.R. NO. 8254   *   SUPERIOR COURT REPORTERS
222 EAST WEBER AVE., ROOM B-69, STOCKTON, CA 95202 (209)468-2840

000419

```
 1   you signed the affidavit?
 2   A.   Yes.
 3   Q.   Are you still of that opinion?
 4            THE COURT:  What's the date of that
 5   affidavit?
 6            MR. WRIGHT:  I believe it's June -- just a
 7   moment.  June 30th.
 8            THE COURT:  The year?
 9            MR. WRIGHT:  Of 2000.
10            THE WITNESS:  I'm afraid you're going to
11   characterize my opinion at the time wrongly because of the
12   confines of the question.
13       My opinion at that time was that she could have been
14   killed there or elsewhere.  I honestly did not know.  I did
15   not have an opinion as to how she was killed or where she
16   was killed.
17            MR. WRIGHT:  Q.  Well, you didn't know at
18   the time you removed yourself from being lead detective, did
19   you?  You didn't know where she was --
20   A.   No, I did not.
21   Q.   And you still don't?
22   A.   I do not.
23   Q.   Okay.  As lead detective you came into contact with a
24   gentleman by the name of Josh Burroughs, didn't you, early
25   on in the case?
26   A.   Yes.
27   Q.   And Josh Burroughs told you a story about having seen
28   three people run across a vacant lot at Home Depot, about
```

DENISE WHEELER, C.S.R. NO. 8254    *    SUPERIOR COURT REPORTERS
222 EAST WEBER AVE., ROOM B-69, STOCKTON, CA 95202 (209)468-2840

000420

```
 1  Q.    It was -- it was consistent with what you thought
 2  would be not having walked in there; is that right or
 3  being --
 4  A.    From what I observed.
 5  Q.    Why did you think that?
 6  A.    I observed that her feet seemed clear of dust and that
 7  at the time we first found her, she was bare foot so that
 8  would suggest that she didn't have her feet directly
 9  contacting the floor.
10  Q.    Okay.  And the cuts that were around her body were of
11  the type that would normally have made blood spatters in the
12  area if it had -- I'm just using or trying to -- had made
13  blood spatters in the area if she had been killed in that
14  position or had been struck in that position?
15  A.    That's a possibility.
16  Q.    What you thought?
17  A.    What I know was a possibility, yes.
18  Q.    Well, what you thought was very likely; didn't you?
19  A.    Those were my words.
20  Q.    That you made under oath; weren't they?
21  A.    Yes, they were.
22              MR. WRIGHT:  Thank you.
23       I have no further questions, Your Honor, of Detective
24  Morgan.
25              THE COURT:  Redirect.
26              MR. SCHULTZ:  Yes.
27  ///
28              REDIRECT EXAMINATION BY:
```